



SONNY J. OLSEN (USB 11308)
**HEIDEMAN, MCKAY, HEUGLY, & OLSEN, LLC**
2696 North University Avenue, Suite 180
Provo, UT 84604
Telephone: (801) 812-1000
Fax: (801) 374-1724
Email: solsen@hmho-law.com
Attorney for Mitch Horton

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MITCH HORTON,<br><br>     Plaintiff,<br><br>v.<br><br>MURRAY ENERGY CORPORATION, an Ohio corporation; UTAH AMERICAN ENERGY, INC., a Utah corporation; ANDALEX RESOURCES, INC., a Delaware corporation; AGAPITO ASSOCIATES, INC., a Colorado corporation; INTERMOUNTAIN POWER AGENCY (IPA), a political subdivision of the State of Utah; LOS ANGELES DEPARTMENT OF WATER AND POWER (LADWP), a political subdivision of the State of California; and JOHN DOES 1-10,<br><br>     Defendants. | **COMPLAINT**<br>**AND**<br>**JURY DEMAND**<br><br><br><br><br>Civil No. 110911617 PI<br><br>Judge: Peuler |

1

For causes of action against the Defendants, Plaintiffs allege as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff Mitch Horton ("Horton") is a citizen and resident of the State of Utah.

2.      Defendant Murray Energy Corporation ("Murray Energy") is an Ohio corporation doing business in the State of Utah.

3.      Defendant Utah American Energy, Inc. ("UEI") is a Utah corporation doing business in the State of Utah.

4.      Defendant Andalex Resources, Inc. ("Andalex") is a Delaware corporation doing business in the State of Utah.

5.      Defendant Agapito Associates, Inc. ("Agapito") is a Colorado corporation doing business in the State of Utah.

6.      Defendant Intermountain Power Agency ("IPA") is a separate legal entity and political subdivision of the State of Utah.

7.      Defendant Los Angeles Department of Water and Power ("LADWP") is a separate legal entity and political subdivision of the State of California.

8.      All notices and acts required as conditions precedent to the filing of this action against the governmental entity Defendants have been properly accomplished, and the claims have been, or are deemed to be, denied. Pursuant to Utah Code 63G-4-201 (3)(a) notice was sent to Intermountain Power Agency ("IPA") which is under the control and management of the Los

2

Angeles Department of Water and Power by contract operating in the state of Utah. All of the other Defendants are corporations respectively foreign and domestic to the State of Utah.

9.     This Court has jurisdiction over this action under section 78A-5-102(1) of the Utah Code Annotated. All notices and acts required as conditions precedent to the filing of this action against the governmental entity Defendants have been properly accomplished, and the claims have been, or are deemed to be, denied. *See* Utah Regulation R641-114-100 (Persons must exhaust their administrative remedies in accordance with Section 63G-4-401, Utah Code Annotated (1953, as amended), prior to seeking judicial review, unless there is an exception provided for by statute. The IPA was created by Utah Interlocal Cooperation Act, Title 11, Chapter 13, Utah Code Annotated; *See also* IPA Annual Disclosure Report for Fiscal Year 2009-2010, page 4, 1st ¶. Section 208 provides that a public agency under this statute cannot be relieved of a "legal obligation or responsibility", and Section 309 confirms venue is proper in the state district court, for matters not involving controversies over Board actions or contracts).

10.     Venue is proper pursuant to section UCA §78B-3-307.

## GENERAL ALLEGATIONS
### History and Ownership of the Mine

11.     Plaintiff Horton was a rescuer of several trapped minors in the Crandall Canyon Mine Disaster. While attempting to rescue the six trapped miners, Plaintiff was injured on August 16, 2007. Plaintiff also observed the injuries and deaths and the circumstances leading to the injuries and deaths of his colleagues who were also attempting to rescue the victims.

12.     Crandall Canyon Mine has been in operation for many years, first beginning in 1939

3

and continuing through 1955. Genwal Coal Company resumed mining there in 1983.

13.     In 1990 IPA acquired a 50% ownership interest in the mine.

14.     In 1995 Andalex acquired ownership of Genwal Coal Company and the other 50% ownership of Crandall Canyon Mine.

15.     In 1995 Andalex and IPA initiated longwall mining at Crandall Canyon, which greatly increased coal production.

16.     The owners changed the name of the mine operator, Genwal Coal Company, to Genwal Resources, Inc. ("Genwal"). Genwal was the operator of the mine continuously from 1995 through August 2007, and was the employer of the miners who were killed and injured on August 6 and 16, 2007.

17.     By 2007 the mine was approaching the end of its working life. The owners were proceeding with plans to mine out portions of the remaining coal from the rooms and pillars in the main entries ("mains") and from barrier pillars left in place after longwall mining had ceased.

18.     Murray Energy, through its wholly owned subsidiary UEI, acquired the assets of Andalex on August 6, 2006, exactly one year before the catastrophic "bounce" (a violent ejection of rock and coal from the roof, ribs or floor) in the mine that killed the Plaintiff's fellow miners.

## Crandall Canyon Mine Operations Before Ownership by Murray Energy

19.     Prior to the acquisition of Andalex by UEI, thousands of feet of coal had been mined from longwall panels seven through twelve on the north and thirteen through eighteen on the south at the Crandall Canyon Mine in the West Mains area.

20.     In the middle of these two parallel sets of mined out longwall panels were the West Mains areas of room and pillar mining, the entries which functioned as access, ventilation, and coal haulage roads. These mains also provided partial support of the roof due to the pattern of parallel

4

entries and intersecting cross cuts that left square or rectangular coal pillars throughout the length of the mains.

21.     The longwall gob provides little if any support of the roof over the mined out areas. Much of the weight of the overburden above the gob is transferred to barrier coal pillars intentionally left along the sides of the mined out areas to provide roof support.

22.     The previous owners of the Crandall Canyon Mine had left very long barrier pillars of coal approximately 450 feet wide along the sides of the longwall gob. The barrier pillars provided protection for miners from the heavy overburden in the area by spreading the stresses from the overburden onto sufficient amounts of coal pillars so that pressures and stresses were not dangerously concentrated on too little coal.

23.     If the pressures and stresses from the overburden become too high, or are concentrated on too small amounts of coal pillars after mining in the area has been performed, the risk of violent and dangerous bounces – explosions of coal and rock – is increased. The risk of bounces increases dramatically as the depth of the overburden above the coal seam increases.

24.     The Crandall Canyon Mine is a "deep cover" coal mine, defined as one with overburden over 750 feet deep. In the area of the north and south barrier pillars of West Mains where Defendants were mining in 2007, the overburden was between 1,300 and 2,200 feet deep.

25.     In 2004, Andalex, which, along with IPA, owned the Crandall Canyon Mine at the time, notified the United States Mine Safety and Health Administration ("MSHA") and the Bureau of Land Management ("BLM") that it intended to seal the West Mains of the Crandall Canyon Mine due to deteriorating conditions of the pillars in the mains. Andalex had concluded from its engineering studies that pulling out the remaining pillars and allowing controlled roof collapses as the miners retreat

5

towards the mine entrance – "retreat mining" – could not be safely accomplished.

26.     MSHA approved the plan to seal the West Mains in October 2004. On November 4,

2004, BLM Inspector Stephen Falk visited the Crandall Canyon Mine and reported that West Mains were

taking unacceptable weight and that the situation in West Mains made future pillar recovery untenable.

Engineer Falk wrote clearly of the danger presented by pulling the pillars in West Mains:

> *"No mining company in the area has ever pulled pillars in main entries with mined out*
> *sides and under 1500+ feet of cover . . . . Attempts to split pillars under this depth*
> *could not hold the top and prevent pillar outbursts*
> *. . . . Depth of cover precludes pillar recover[y] even if there were no mined*
> *out sections next door. Weight on the pillars is substantial and dangerous*
> *conditions are present. Mining any of the coal in the pillars will result in*
> *hazardous mining conditions such as pillar bursts and roof falls."*

27.     In February 2005, BLM echoed engineer Falk's findings and, despite its charge to

maximize recovery of coal reserves, approved Andalex's plan to seal the West Mains:

> *"We agree that the pillars in Main West inby crosscut 116 cannot be recovered safely*
> *or practically. We also concur with sealing the area as the coal is not recoverable . . ."*

28.     Andalex had been doing retreat mining in 2006 in the South Mains of the mine, which also

were located between two sets of longwall gob.

29.     The retreat mining in the South Mains had been plagued with bounces and roof collapses,

especially as it came under deeper cover, although no serious mining accidents had been reported.

30.     Regarding the barrier pillars in the mine, Andalex submitted a mining plan in April

2005 to the Utah Division of Oil, Gas and Mining ("DOGM") providing that *"solid coal barriers will be*

*left [in the Crandall Canyon Mine] to protect main entries from mined out panels and to guarantee*

*stability of the mine entries for the life of the mine."* This was consistent with earlier mine plans to preserve

6

the barrier pillars in the mine for safety reasons. Genwal Coal Company, the operator of the mine, had documented that:

> *"the plan shows no [retreat] mining of barrier pillars is planned at this time. Barrier pillars are designed to protect mine workings by supporting stresses that are redistributed from the mining of section panels. Because these barriers are 'loaded up' with high concentrations of stresses it is not good mining practice to [retreat] mine barrier pillars and in fact could be dangerous."*

31.     In 2006, Andalex proposed to do development mining (room and pillar mining "inby," or towards the interior) of the north and south barrier pillars along the West Mains. The plan was to mine some of the 450-foot-wide barrier pillars, leaving thinner solid "remnant" barrier pillars adjacent to the gob, and creating rooms and pillars from the rest of the barrier pillars.

### Crandall Canyon Mine Operations After Ownership by Murray Energy

32.     On August 6, 2006, Murray Energy's wholly owned subsidiary UEI acquired Andalex and its percentage ownership of the Crandall Canyon Mine. Thereafter, Murray Energy's subsidiaries UEI and Andalex and IPA co-owned the Crandall Canyon Mine.

33.     Murray Energy and UEI/Andalex immediately pressed ahead with the plan to do development mining of the north barrier pillar, commencing mining in November 2006.

34.     Murray Energy and UEI/Andalex not only pushed ahead with the barrier pillar development, but also decided to retreat mine the pillars created from the barrier development, contrary to the long-standing plans of the prior mine owners not to retreat mine the West Mains barrier pillars, and contrary to previous assessments of prior owner management and officials that retreat mining of the barriers was unsafe.

7

**Agapito Encourages Barrier Pillar Retreat Mining**

35.     Murray Energy and UEI/Andalex employed Agapito to provide them with an engineering analysis to justify their plan to do development *and* retreat mining of the West Mains barrier pillars.

36.     Agapito did the engineering analysis and presented to Murray Energy and UEI/Andalex its conclusions and recommendations in three stages, in July 2006, August 2006, and April 2007.

37.     Agapito calculated the stability factors of the standard production coal pillars and barrier Pillars using both the ARMPS – Analysis of Retreat Mining Pillar Stability – and LAMODEL modeling, concluding in its reports to UEI/Andalex that the north and south barrier pillars could be safely mined in development and also in retreat.

38.     Agapito's analysis was flawed and not conservative in the least, and its conclusions were critically unsafe. The United States National Institute of Occupational Safety and Health ("NIOSH") found in a September 2007 study that Agapito's modeling was "very unconservative" and "substantially overstate[d]".

39.     NIOSH, from comprehensive analyses of coal mines in 1996 and 2002, had determined and published that the recommended minimum production pillar stability factor for deep cover mines was 0.8, and the recommended minimum barrier pillar stability factor for deep cover mines was 2.0. Agapito's modeling using ARMPS showed production pillar stability factors ranging from 0.32 to 0.52, and barrier pillar stability factors ranging from 0.91 to 0.95 – stability factors far lower than, and in most cases less than half of, the NIOSH minimum recommended stability factors.

40.     Agapito's analysis using LAMODEL was likewise unrealistic, flawed, and not conservative enough due to improper assumptions and data concerning coal strength throughout the area

8

and improper assumptions of stress concentrations and convergence. Agapito's flawed analysis led it to report to UEI/Andalex erroneous and improperly high stability factors. NIOSH has found that the Agapito LAMODEL analysis was "misleading" with a "conspicuous lack of scientific, quantitative design criterion."

41.     Agapito engineers knew that their ARMPS stability factors for the West Mains barrier pillar mining plan were far below the NIOSH minimums. But, Agapito justified its plan, claiming that the pillars *"are not intended for long-term performance and, therefore, can accept a reduced design safety margin compared to typical life-of mine mains pillars."* Agapito infamously gambled that *"[b]ecause rib yielding and roof sag are time-dependent effects, it is probable that mining will be completed in the barriers before rib and roof conditions show advanced deterioration."* By providing a plan allowing Murray Energy to mine out most of the West Mains barrier pillar coal, Agapito failed to properly assess all the risks of the mining conditions and lost its bet. But, it was the Plaintiff that paid the dramatic vprice of Agapito's irresponsible gamble in his attempts to rescue the trapped miners.

### Murray Energy's Unsafe Plan to Mine the West Mains Barrier Pillars

42.     Based in part on the first two misleading and flawed Agapito reports to UEI/Andalex, Murray Energy and UEI/Andalex obtained MSHA approval for retreat mining in the north barrier and began retreat mining on February 16, 2007. The MSHA approval was obtained despite the prior warnings of an MSHA inspector, Pete Del Duca, that complete retreat mining in the north barrier pillar would be unsafe.

43.     Almost immediately Murray Energy and UEI/Andalex submitted a plan to begin development mining in the south barrier pillar, again basing their plan in part on the flawed Agapito

9

analysis.

44.    BLM inspector Falk visited the Crandall Canyon Mine on February 27, 2007 and reported that he was concerned with the north barrier pillar extraction progress.

45.    In March 2007, as the retreat mining came under deeper cover, repeated bounces, roof falls and rib sloughage occurred. These dangerous conditions were discussed in a meeting of the mine owners and agents, Murray Energy, UEI, IPA, and LADWP, on March 10, 2007, and were specifically acknowledged by Murray Energy CEO Robert Murray. Yet none of these increasingly ominous signs of danger during the first ten days of March were recorded by Murray Energy or UEI/Andalex in the pre-shift logs, which MSHA required them to keep and make available to MSHA inspectors.

46.    On March 11, 2007, a major bounce occurred in the north barrier during retreat mining. The bounce was so violent that it destroyed parts of the ventilation system, stoppings, and other structures in over 800 feet in the area, forcing the abandonment and sealing of that section of the mine. Apparently, and fortunately for all involved, no one was seriously injured in that event.

47.    The March 11 bounce was required to be reported to MSHA *immediately* (within 15 minutes), but Murray Energy and UEI/Andalex deliberately did not do so, apparently justifying their violation of the reporting regulation by their decision to cease retreat mining in the north barrier. Robert Murray was personally notified of the March 11 bounce that very day and also attended a mine owners' meeting by phone on March 21, at which the north barrier bounce was discussed in detail, contradicting his public claims in August 2007 after the disaster that he had no prior knowledge of the March 11 north barrier bounce.

48.    In light of the March 11, 2007, bounce, Genwal asked Agapito to "refine the pillar

10

design" for the south barrier retreat mining plan based on the bounce in the north barrier pillar. Agapito provided a revised plan on April 18, which essentially increased the pillar length of the development pillars from 80 x 92 feet to 80 x 129 feet, "*which helps to isolate bumps to the face and reduce the risk of larger bumps overrunning crews in outby locations.*"

49.     Agapito's revised south barrier pillar development and retreat plan also provided that the remnant barrier pillar would be reduced to only 97 feet width, and would be "slabbed," meaning that 40-foot-long cuts of coal would be taken out of the remnant barrier. Agapito recognized that the "*slabbed barrier will be subject to side abutment loads from gob on both sides, resulting in elevated stress levels through the core.*"

50.     Even before receiving the Agapito revisions of the pillar recovery plan in April, Murray Energy and the mine co-owners continued the same barrier mining plan in the south barrier pillar, only 900 feet from where they had been mining in the north barrier from February 16 to March 11. The cover and conditions were virtually identical, and so were the risks and dangers.

51.     The devastating March 11 bounce made absolutely no difference to Murray Energy management, and Murray Energy and the mine co-owners proceeded with their plan to mine the south barrier pillar in the very same dangerous fashion they had done in the north barrier, demonstrating greedy determination to mine the easily accessible coal without regard to safety.

52.     Had Murray Energy and the mine co-owners conducted post-failure modeling of the March 11, 2007, bounce, they could have accurately determined the stress levels at which the coal pillars failed (bounced). Such a comparison would have shown south barrier pillar stress levels as great as the stress levels which caused failure in the north barrier, again indicating excessive pillar loading and a predictable pillar bounce.

11

53.    However, Murray Energy and the mine co-owners conducted no failure analysis of the north barrier pillar bounce and no comparison of the existing primary bounce conditions (depth of cover, geologic environment, and coal strength), even though the most cursory comparison would have strongly indicated the probability of a second devastating bounce while mining in the south barrier pillar.

54.    On July 17, less than three weeks before the disastrous bounce of August 6, Murray Energy and UEI/Andalex began retreat mining the south barrier pillar.

### Murray Energy Continued to Retreat Mine Despite Warnings and Signs of Danger, and in Contravention of Express Mine Plan Prohibitions

55.    Based on inspected conditions in the south barrier area in late May 2007, MSHA had required modification of the Roof Control Plan in the area of crosscuts 139 to 142 by requiring three additional pillars to be left in place, and to not slab the remnant pillar. These changes to the plan were not followed. The pillars were pulled and the remnant barrier was slabbed in direct contravention of the Roof Control Plan and MSHA restrictions, at the very site where miners were working at the time of the mine bounce of August 6, 2007.

56.    As with the north barrier, signs of increased pressure and stress mounted as south barrier development proceeded in May, June, and July. On June 5th Genwal manager reported to the UEI manager *"constant bumping and sloughing of the ribs,"* although the pre-shift reports again do not reflect adverse seismic events or mine conditions. On June 22 UEI President Bruce Hill reported to Robert Murray in a memo that "*several bumps are occurring and the ribs show significant signs of sloughage,*" which Mr. Murray acknowledged by writing *"noted."*

57.    After retreat mining began on or about July 16, company reports revealed

12

increasingly bad conditions as the retreat proceeded under deeper cover. Mr. Hill reported by an August 3 memo to Mr. Murray that "significant sloughage is occurring outby the face."

58.     Mr. Murray was expressly informed that south barrier pillars were being pulled and retreat mining was in full swing just before the August 6 bounce, in contrast to his repeated denials at press conferences in the days after the bounce that retreat mining was being done.

59.     On August 2 a management meeting report noted "a lot of floor heaving that took a lot of clean up." On August 3 an internal safety report documented a bounce occurred just before the night shift. Most of these increasing stress signals were not reflected in the company pre-shift logs for review by MSHA.

60.     In addition to the violations noted above of the amended Roof Control Plan, Murray Energy and UEI/Andalex had been violating express prohibitions against mining coal from the floor during pillar pulling operations, including on August 6, at the time of the fatal bounce. The illegal practice at Crandall Canyon Mine of mining floor coal was commonplace and was well known by, and appears to have been condoned and encouraged by, Murray Energy CEO Robert Murray.

## The Fatal August Bounces and Rescue Efforts

61.     Early in the morning of August 6, 2007, the catastrophic bounce registering 3.9 at the University of Utah seismology lab occurred, trapping and eventually killing Kerry Allred, Don Erickson, José Luis Hernandez, Juan Carlos Payan, Brandon Phillips, and Manuel Sanchez.

62.     The August 6 disaster triggered frenetic rescue efforts by MSHA and Murray Energy. Robert Murray and Murray Energy usurped MSHA's statutory duty to oversee, supervise, and run the rescue operation. As a result, Murray Energy, acting primarily through and by its CEO, Robert Murray,

13

took over the management of the rescue advisories, updates, and meetings with mine victim families and friends. Murray Energy engaged in multiple acts of abusive and unconscionable behavior, subjecting the Plaintiff to additional and inexcusable emotional pain and upset.

63.    Rescue efforts were hampered by repeated bounces and other seismic events throughout the next ten days, which damaged roof supports, rescue and digging equipment, and passageways. By August 16 rescue teams had progressed only about 800 feet of the approximately 2000+ feet to the estimated location of the trapped miners.

64.    In or about August 16 an explosive bounce occurred near the site of the rescue operations Nine rescuers were caught in the bounce. Three miners, Dale Black, Brandon Kimber, and Gary Jensen were killed. Six other rescuers, including the Plaintiff, were injured.

65.    Deteriorating conditions and increasing seismic events at the site of the rescue operations preceded the fatal bounce in the last few days before August 16, yet operations continued.

66.    As a result of the August 16 bounce, all rescue efforts at the level of the entries to the West Mains ceased. After drilling and monitoring seven bore holes from above, all of which were unsuccessful in detecting any signs of life, all rescue and recovery efforts were terminated on September 1, 2007.

## Defendants Owed and Breached Duties of Care

67.    Defendants owed duties of care to Plaintiff, based on each Defendant's respective responsibilities activities, involvement, and efforts in connection with retreat mining in the West Mains areas of the Crandall Canyon Mine in 2007.

68.    Defendants prepared, contributed to, participated in, or oversaw the preparation and

14

implementation of the plans to mine in the West Mains at the Crandall Canyon Mine; required, permitted, encouraged, or failed to prevent dangerous and inappropriate mining activities or practices; and otherwise engaged or were involved in the implementation and conduct of the plans, practices, and activities at Crandall Canyon Mine, as described above.

69. Careful and conservative planning and execution of safe mine plans and sufficient safety margins were necessitated by virtue of the inherent and extraordinary hazards of the mining being done in the Crandall Canyon Mine, including but not limited to retreat mining under deep cover.

70. Murray Energy, UEI, Andalex, IPA, and LADWP had duties to Plaintiff to keep and maintain the mine in reasonably safe condition.

71. Murray Energy, UEI, Andalex, IPA, and LADWP knew, or should have known, that their premises were in a dangerous condition that posed unreasonable hazards to those working in and entering the mine.

72. Defendants breached their respective duties of care to Plaintiff by negligently, recklessly, or intentionally acting or failing to act as described above, including their failure and refusal to create, use, follow, or implement careful, safe, and conservative mining plans for the West Mains areas.

73. Defendants negligently, recklessly, or intentionally, in contravention of approved plans, good mining practices, and common sense, engaged in mining activities and extracted coal in methods and ways that led to unsafe degradation of structural integrity, support, and stability within the Crandall Canyon Mine, which acts and omissions directly and proximately caused the explosive bounces described above and the subsequent deaths of Plaintiff's colleagues and caused the significant injuries of Plaintiff.

74. Murray Energy and UEI/Andalex negligently, recklessly or intentionally, in contravention

15

of approved plans, mining laws, good mining practice, and common sense, took over the rescue efforts and operations and sent Plaintiff into the mine in the face of warnings and signs of grave danger of further catastrophic bounces.

75.     Murray Energy and UEI/Andalex, by and through Robert Murray and others, usurped MSHA responsibilities regarding communications and interactions with the miner victims' families in violation of applicable mining laws and human decency, provided information to the Plaintiff that was false or misleading, and treated the Plaintiff in a disrespectful, abusive, and insensitive manner, causing him extreme emotional suffering, fear, and upset.

76.     The acts and omissions by the Defendants as described above were motivated by avarice and greed, at the expense of safety and human life, are shocking to the conscience, manifested a knowing and reckless indifference toward and a disregard of the rights of the Plaintiff justifying the imposition of punitive damages.

77.     The Defendants are vicariously liable for the negligent, reckless, and intentional acts and omissions of their respective employees and agents.

## FIRST CAUSE OF ACTION
### Personal Injuries -- All Defendants

78.     Plaintiff incorporates the allegations of paragraphs 1 through 77, above.

79.     On August 16, 2007, Mitch Horton was acting within the scope of his employment with Genwal. He was attempting to rescue the men trapped in the mine when another mine bounce and subsequent collapse occurred, severely injuring him.

80.     Defendants, or one or more of them as owners, managers, consultants to, or overseers of the Crandall Canyon Mine, reserved and undertook to perform various duties and responsibilities related

16

to the design, engineering, planning, and operation of the mine and mine rescue efforts, including but

not limited to the following:

     (a)    Providing for safety in the mine;

     (b)    Preparing, reviewing, and approving mine plans, practices, and procedures and
seeing that they were followed;

     (c)    Preparing, reviewing, and approving plans, practices, and procedures for roof control
systems and seeing that they were followed;

     (d)    Reviewing and implementing rock mechanics and geological studies and practices;

     (e)    Setting and fostering attitudes regarding production and profit in relation to safety;

     (f)    Deciding when, whether, and how the mine rescue and recovery efforts would be
undertaken;

     (g)    Determining the equipment, materials, and supplies to be used in, and in association with,
the mine rescue and recovery efforts; and

     (h)    Determining and implementing the proper methods and materials to detect, prevent,
control, and protect from subsequent bounces, collapse and other undesirable and
unplanned ground movement, knowing that a catastrophic bounce and mine collapse
had already occurred.

    81.    Defendants negligently, recklessly, or intentionally performed or failed to perform those

duties and undertakings, directly and proximately causing the severe injuries to Mitch Horton.

    82.    As a direct and proximate result of Defendants' acts and omissions described above,

Plaintiff Mitch Horton has suffered severe and permanent injuries, including pain and suffering, fear of

death, uncertainty of his predicament, and emotional and mental distress.

    83.    As a direct and proximate result of Defendants' acts and omissions described above,

Plaintiff Mitch Horton has incurred and will continue to incur medical expenses, loss of past and future

wages, loss of earning capacity, expenses for household services, and other economic damages.

    84.    The acts and omissions of the Defendants resulting in the severe injuries to Mitch

Horton were willful, wanton, and manifested a knowing and reckless indifference toward and a disregard

17

for human life and safety and the rights of Mitch Horton, by reason of which punitive damages should be assessed against the Defendants.

## SECOND CAUSE OF ACTION
### Loss of Consortium -- All Defendants

85.    Plaintiff incorporates the allegations of paragraphs 1 through 77 and 78 through 84, above.

86.    By reason of the severe and significant permanent physical and emotional injuries suffered by Mitch Horton that have substantially changed his lifestyle, Plaintiff Mitch Horton has suffered loss of consortium, companionship, affection, and marital intimacy, all to his damage in amounts to be proved at trial.

## THIRD CAUSE OF ACTION
### Strict Liability for Ultra-Hazardous Activities – Murray Energy, UEI, Andalex, IPA, and LADWP

87.    Plaintiff incorporates the allegations of the preceding paragraphs.

88.    The activities and conditions that Murray Energy, UEI, Andalex, IPA, and LADWP caused, directed, created, or permitted, were ultra-hazardous and inherently dangerous. These Defendants are strictly liable to Plaintiff for all injuries and damages alleged.

## FOURTH CAUSE OF ACTION
### Premises Liability -- Murray Energy, UEI, Andalex, IPA, and LADWP

89.    Plaintiff incorporates the allegations of the preceding paragraphs.

90.    Murray Energy, UEI, Andalex, IPA, and LADWP had duties to keep their property in reasonably safe condition.

91.     Murray Energy, UEI, Andalex, IPA and LADWP created, maintained, or permitted conditions at the Crandall Canyon Mine that were unreasonably dangerous and posed unreasonable hazards to those who worked in or entered the mine, by reason of which they are liable to Plaintiff for the damages alleged.

### FIFTH CAUSE OF ACTION
### Infliction of Emotional Distress -- Murray Energy, UEI, and Andalex

92.     Plaintiff incorporates the allegations of paragraphs 1 through 91, above.

93.     The conduct of Murray Energy, UEI, and Andalex, by and through their agents, including but not limited to Robert Murray, was outrageous and intolerable and offended generally accepted standards of decency, morality, and civility.

94.     Murray Energy, UEI, and Andalex, by and through their agents, including but not limited Robert Murray, intended to cause or acted with reckless disregard of the probability of causing emotional distress or should have realized that their conduct involved an unreasonable risk of causing the Plaintiff's emotional distress.

95.     The conduct of Murray Energy, UEI, and Andalex, by and through their agents, including but not limited to Robert Murray, proximately caused severe emotional distress resulting in illness or bodily harm to Plaintiff, by reason of which Plaintiff should be awarded damages in amounts to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1.   For economic damages in amounts to be proved at trial sufficient to fully compensate Mitch

Horton, including but not limited to medical expenses, lost wages and benefits, lost earning capacity, and all other recoverable economic damages resulting from his personal injuries;

2.    For all recoverable non-economic damages resulting from the personal injuries to Mitch Horton in amounts to be proved at trial sufficient to fully compensate him;

3.    For damages in amounts to be proved at trial sufficient to fully compensate Plaintiff Mitch Horton for his losses of consortium and all other damages;

4.    For attorneys' fees, expenses, and costs of this action as allowed by law;

5.    For punitive damages in amounts to be determined and assessed against the Defendants, as allowed by law;

6.    For pre-judgment and post-judgment interest in the maximum amounts allowed by law; and

7.    For such further relief as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this complaint.

DATED this ___3rd___ day of ___August___, 2011.

HEIDEMAN, MCKAY, HEUGLY & OLSEN

SONNY OLSEN
Attorney for Plaintiff

20

# COVER SHEET FOR CIVIL FILING ACTIONS

Page 1 of 3

## Party Identification (Attach additional sheets as necessary)

| PLAINTIFF/PETITIONER | ATTY FOR PLAINTIFF/PETITIONER |
|---|---|
| Name   Mitch Horton | Name:   Sonny J. Olsen          Bar # 11308 |
| Address   90 S. 100 W., Huntington, UT  84528<br>Phone:   435 687 9153 | Address: 2696 N. Univ. Ave. Suite 180, Provo, UT 84604   Phone: 801 812 1000 |

| PLAINTIFF/PETITIONER | ATTY FOR PLAINTIFF/PETITIONER |
|---|---|
| Name | Name                          Bar # _____ |
| Address | Address |

| DEFENDANT/RESPONDENT | ATTY FOR DEFENDANT/RESPONDENT |
|---|---|
| Name  Murray Energy Corporation | Name                          Bar # _____ |
| Address  29325 Chagrin Blvd., Suite 300<br>        Pepper Pike, OH  44122 | Address |

| DEFENDANT/RESPONDENT | ATTY FOR DEFENDANT/RESPONDENT |
|---|---|
| Name  Utah American Energy, Inc. | Name                          Bar # _____ |
| Address  29325 Chagrin Blvd. #300<br>        Pepper Pike, OH  44122 | Address |

| DEFENDANT/RESPONDENT | ATTY FOR DEFENDANT/RESPONDENT |
|---|---|
| Name  Andalex Resources, Inc. | Name                          Bar # _____ |
| Address 6750 N. Airport Rd.<br>        Price, UT  84501 | Address |

| DEFENDANT/RESPONDENT | ATTY FOR DEFENDANT/RESPONDENT |
|---|---|
| Name   Agapito Associates, Inc. | Name                          Bar # _____ |
| Address   715 Horizon Dr., Ste 340<br>        Grand Junction, CO  81506 | Address |
|  | ATTY FOR DEFENDANT/RESPONDENT |

| DEFENDANT/RESPONDENT | Name                          Bar # _____ |
|---|---|
| Name   Intermountain Power Agency | Address |
| Address  10653 S. Riverfront Pkwy, Ste 120, South Jordan, UT 84095       phone: 801 799 5800 | ATTY FOR DEFENDANT/RESPONDENT |
|  | Name                          Bar # _____ |

DEFENDANT/RESPONDENT

Name Los Angeles Department of Water and Power

Address Registered Agent: Los Angeles City Attorney's Office, 200 N. Main Street, 8th Floor Los Angeles, CA 90012

Address

ATTY FOR DEFENDANT/RESPONDENT

Name                                          Bar # _____

Address

**DEFENDANT/RESPONDENT**

Name

Address

ATTY FOR DEFENDANT/RESPONDENT

Name                                          Bar # _____

Address

**DEFENDANT/RESPONDENT**

Name

Address

ATTY FOR DEFENDANT/RESPONDENT

Name                                          Bar # _____

Address

**DEFENDANT/RESPONDENT**

Name

Address

ATTY FOR DEFENDANT/RESPONDENT

Name                                          Bar # _____

Address

**DEFENDANT/RESPONDENT**

Name

Address

**TOTAL CLAIM FOR DAMAGES**

$_ _10,000 over _____

**JURY DEMAND**

❑  Yes        ❑  No

**SCHEDULE OF FEES: §78A-2-301. CHECK ANY THAT APPLY.**
(See case types on reverse for filing fees for complaints other than claims for damages.)

-------- **COMPLAINT FOR DAMAGES** --------

$75   ❑   Civil or Interpleader: $2000 or less
      ❑   Civil or Interpleader: $2001 - $9999
$185
$360  ☒   Civil or Interpleader: $10,000 & over
$360  ❑   Civil Unspecified

-------------- **MISCELLANEOUS** --------------

$250  ☒   Jury Demand
$8    ❑   Vital Statistics §26-2-25 per form

---------------- **SMALL CLAIMS** ------------------

$60   ❑   Small Claims: $2000 or less
$100  ❑   Small Claims: $2001-$7500

# COVER SHEET FOR CIVIL FILING ACTIONS   Page 3 of 3
## Please Check Only One Category

| Fee | | Case Type | Fee | | Case Type |
|---|---|---|---|---|---|
| | | **—————— APPEALS ——————** | $360 | ❑ | Grandparent Visitation |
| $360 | ❑ | Administrative Agency Review | $360 | ❑ | Paternity/Parentage |
| $225 | ❑ | Civil (78A-2-301(1)(h)) | $100 | ❑ | Domestic Modification |
| $225 | ❑ | Small Claims Trial de Novo | $310 | ❑ | Separate Maintenance |
| | | | $35 | ❑ | Temporary Separation |
| | | **———— GENERAL CIVIL ————** | $35 | ❑ | Uniform Child Custody Jurisdiction Act (UCCJA) |
| $360 | ❑ | Attorney Discipline | | | |
| Sch | ❑ | Civil Rights | $25 | ❑ | Uniform Interstate Family Support Act (UIFSA) |
| $ 0 | ❑ | Civil Stalking | | | |
| $360 | ❑ | Condemnation/Eminent Domain | | | **————— JUDGMENTS —————** |
| Sch | ❑ | Contract | $25 | ❑ | Abstract of Foreign Judgment |
| Sch | ❑ | Debt Collection | $40 | ❑ | Abstract of Judgment or Order of Utah Court/Agency |
| Sch | ❑ | Eviction/Forcible Entry and Detainer | | | |
| $135 | ❑ | Expungement (Fee is $0 under circumstances of §77-18-10(2)) | $30 | ❑ | Abstract of Judgment/Order of Utah State Tax Commission |
| $360 | ❑ | Extraordinary Relief/Writs | $25 | ❑ | Judgment by Confession |
| $360 | ❑ | Forfeiture of Property | | | **—————— PROBATE ——————** |
| Sch | ❑ | Interpleader | $155 | ❑ | Adoption/Foreign Adoption |
| Sch | ❑ | Lien/Mortgage Foreclosure | $155 | ❑ | Conservatorship |
| Sch | ❑ | Malpractice | $155 | ❑ | Estate Personal Rep - Formal |
| Sch | ❑ | Miscellaneous Civil | $155 | ❑ | Estate Personal Rep - Informal |
| Sch | ☒ | Personal Injury | $25 | ❑ | Foreign Probate/Child Custody Doc. |
| $360 | ❑ | Post Conviction Relief: Capital | $155 | ❑ | Gestational Agreement |
| $360 | ❑ | Post Conviction Relief: Non-capital | $155 | ❑ | Guardianship |
| Sch | ❑ | Property Damage | $ 0 | ❑ | Involuntary Commitment |
| Sch | ❑ | Property/Quiet Title | $155 | ❑ | Minor's Settlement |
| Sch | ❑ | Sexual Harassment | $155 | ❑ | Name Change |
| Sch | ❑ | Tax | $155 | ❑ | Supervised Administration |
| Sch | ❑ | Water Rights | $155 | ❑ | Trusts |
| Sch | ❑ | Wrongful Death | $155 | ❑ | Unspecified Probate |
| $360 | ❑ | Wrongful Lien | | | |
| Sch | ❑ | Wrongful Termination | | | **———— SPECIAL MATTERS ————** |
| | | **—————— DOMESTIC ——————** | $25 | ❑ | Arbitration Award |
| $0 | ❑ | Cohabitant Abuse | $0 | ❑ | Determination Competency-Criminal |
| $310 | ❑ | Common Law Marriage | $0 | ❑ | Hospital Lien |
| $310 | ❑ | Custody/Visitation/Support | $25 | ❑ | Judicial Approval of Document Not Part of Pending Case |
| $310 | ❑ | Divorce/Annulment | | | |
| | | ❑ Check if child support, custody or parent-time will be part of decree | $25 | ❑ | Notice of Deposition in Out-of-State Case/Foreign Subpoena |
| | | ❑ Check if Temporary Separation filed | | | |
| $35 | ❑ | Foreign Domestic Decree | $25 | ❑ | Open Sealed Record |

*Aug 5, 2011*
*11:34 am*

SONNY J. OLSEN (USB 11308)
**HEIDEMAN, MCKAY, HEUGLY, & OLSEN, LLC**
2696 North University Avenue, Suite 180
Provo, UT 84604
Telephone: (801) 812-1000
Fax: (801) 374-1724
Email: solsen@hmho-law.com
Attorney for Mitch Horton

---

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MITCH HORTON,<br><br>Plaintiff,<br>v.<br><br>MURRAY ENERGY CORPORATION, an Ohio corporation; UTAH AMERICAN ENERGY, INC., a Utah corporation; ANDALEX RESOURCES, INC., a Delaware corporation; AGAPITO ASSOCIATES, INC., a Colorado corporation; INTERMOUNTAIN POWER AGENCY (IPA), a political subdivision of the State of Utah; LOS ANGELES DEPARTMENT OF WATER AND POWER (LADWP), a political subdivision of the State of California; and JOHN DOES 1-10,<br><br>Defendants. | **SUMMONS**<br><br><br><br><br><br><br>Civil No.: 110916617<br><br>Judge: Sandra Peuler |

---

THE STATE OF UTAH TO DEFENDANT: **INTERMOUNTAIN POWER AGENCY**

Registered Agent   -   James A. Hewlett
10653 S. River Front Pkwy, Ste 120
South Jordan, UT 84095

1

You are hereby summoned and required to file an ANSWER in writing to the

COMPLAINT in the above-entitled case within twenty (20) days after service of this Summons.

You must file your written ANSWER with the Clerk of the Court at the Third Judicial District

Court in and for Salt Lake County, State of Utah at the following address: 450 South State, P.O.

Box 1860, Salt Lake City, UT 84114, (801) 238-7315. You must also mail or deliver to

Heideman, McKay, Heugly & Olsen, L.L.C., Plaintiff's attorney, at the above address, a copy of

the ANSWER within twenty (20) days after service of this SUMMONS upon you.

If you fail to do so, JUDGMENT BY DEFAULT will be taken against you for the relief

demanded in said COMPLAINT that is on file with the Clerk of Third Judicial District Court, a

copy of which COMPLAINT is hereto annexed and herewith served upon you.

DATED this $\underline{4^{th}}$ day of August, 2011.

**HEIDEMAN, MCKAY, HEUGLY, & OLSEN, L.L.C.**

SONNY J. OLSEN,
Attorney for Plaintiff

Defendant:

INTERMOUNTAIN POWER AGENCY
10653 S. Riverfront Pkwy, Ste 120
South Jordan, UT 84095

2

 CT Corporation

**Service of Process Transmittal**
08/05/2011
CT Log Number 518948709

| | |
|---|---|
| **TO:** | Chris Van Bever, Associate General Counsel<br>Murray Energy Corporation<br>101 Prosperous Place, Suite 125<br>Lexington, KY 40509 |

**RE:** **Process Served in Utah**

**FOR:** Andalex Resources, Inc. (Domestic State: DE)
*According to our records representation services for this entity have been discontinued in this jurisdiction.*

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Mitch Horton, Pltf. vs. Murray Energy Corporation, etc., et al., Including: Anadalex Resources, Inc., Garnishee |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Third District Court, Salt Lake County, Salt Lake Department, UT<br>Case # 110916617 |
| **NATURE OF ACTION:** | Personal Injury - Defendants negligent, recklessly, or initentionally performed or failed to perform |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Salt Lake City, UT |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/05/2011 at 10:25 |
| **JURISDICTION SERVED :** | Utah |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days |
| **ATTORNEY(S) / SENDER(S):** | Sonny J. Olsen<br>Heidman, McKay, Heugly, & Olsen, LLC<br>2696 North University Avenue, Suite 180<br>Provo, UT 84604<br>801-812-1000 |
| **REMARKS:** | C T Corporation is still listed as the registered agent per the State of Utah, Division of Corporations. |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 795052553677<br>Email Notification, Michael McKown mmckown@coalsource.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:** | C T Corporation System<br>Amy McLaren<br>136 East South Temple<br>Suite 2100<br>Salt Lake City, UT 84111 |
| **TELEPHONE:** | 800-592-9023 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

SONNY J. OLSEN (USB 11308)
**HEIDEMAN, McKAY, HEUGLY, & OLSEN, LLC**
2696 North University Avenue, Suite 180
Provo, UT 84604
Telephone: (801) 812-1000
Fax: (801) 374-1724
Email:  solsen@hmho-law.com
Attorney for Mitch Horton

---

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MITCH HORTON,<br><br>        Plaintiff,<br><br>v.<br><br>MURRAY ENERGY CORPORATION, an Ohio corporation; UTAH AMERICAN ENERGY, INC., a Utah corporation; ANDALEX RESOURCES, INC., a Delaware corporation; AGAPITO ASSOCIATES, INC., a Colorado corporation; INTERMOUNTAIN POWER AGENCY (IPA), a political subdivision of the State of Utah; LOS ANGELES DEPARTMENT OF WATER AND POWER (LADWP), a political subdivision of the State of California; and JOHN DOES 1-10,<br><br>        Defendants. | **SUMMONS**<br><br><br><br><br><br>Civil No.:  110916617<br><br>Judge:   Sandra Peuler |

THE STATE OF UTAH TO DEFENDANT: **ANDALEX RESOURCES, INC**.

Registered Agent  -   C T CORPORATION SYSTEM
                      136 East South Temple, Suite 2100
                      Salt Lake City, UT 84111

1

You are hereby summoned and required to file an ANSWER in writing to the

COMPLAINT in the above-entitled case within twenty (20) days after service of this Summons.

You must file your written ANSWER with the Clerk of the Court at the Third Judicial District

Court in and for Salt Lake County, State of Utah at the following address: 450 South State, P.O.

Box 1860, Salt Lake City, UT 84114, (801) 238-7315. You must also mail or deliver to

Heideman, McKay, Heugly & Olsen, L.L.C., Plaintiff's attorney, at the above address, a copy of

the ANSWER within twenty (20) days after service of this SUMMONS upon you.

If you fail to do so, JUDGMENT BY DEFAULT will be taken against you for the relief

demanded in said COMPLAINT that is on file with the Clerk of Third Judicial District Court, a

copy of which COMPLAINT is hereto annexed and herewith served upon you.

DATED this _____4th_____ day of August, 2011.

HEIDEMAN, MCKAY, HEUGLY, & OLSEN, L.L.C.

SONNY J. OLSEN,
Attorney for Plaintiff

Defendant:

ANDALEX RESOURCES, INC.
6750 N. Airport Rd.
Price, UT  84501

2

 CT Corporation

**Service of Process Transmittal**
08/05/2011
CT Log Number 518948756

|||||||||||||||||||||||||||||||||||||||||||||||||||||||||

**TO:** Chris Van Bever, Associate General Counsel
Murray Energy Corporation
101 Prosperous Place, Suite 125
Lexington, KY 40509

**RE:** **Process Served in Utah**

**FOR:** UtahAmerican Energy, Inc. (Domestic State: UT)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Mitch Horton, Pltf. vs. Murray Energy Corporation, etc., et al., Including: Utah American Energy, Inc., Garnishee |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Third District Court, Salt Lake County, Salt Lake Department, UT Case # 110916617 |
| **NATURE OF ACTION:** | Personal Injury - Defendants negligent, recklessly, or initentionally performed or failed to perform |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Salt Lake City, UT |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/05/2011 at 10:25 |
| **JURISDICTION SERVED :** | Utah |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days |
| **ATTORNEY(S) / SENDER(S):** | Sonny J. Olsen Heidman, McKay, Heugly, & Olsen, LLC 2696 North University Avenue, Suite 180 Provo, UT 84604 801-812-1000 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 795052553677 Image SOP Email Notification, Chris Van Bever cvanbever@coalsource.com Email Notification, Michael O McKown mmckown@coalsource.com Email Notification, Kathy Bartek kbartek@coalsource.com Email Notification, Robert E Murray bobmurray@coalsource.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Amy McLaren |
| **ADDRESS:** | 136 East South Temple Suite 2100 Salt Lake City, UT 84111 |
| **TELEPHONE:** | 800-592-9023 |

Page 1 of  1 / KM

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

SONNY J. OLSEN (USB 11308)
**Heideman, McKay, Heugly, & Olsen, LLC**
2696 North University Avenue, Suite 180
Provo, UT 84604
Telephone: (801) 812-1000
Fax: (801) 374-1724
Email:  solsen@hmho-law.com
Attorney for Mitch Horton

---

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MITCH HORTON,<br><br>              Plaintiff,<br><br>v.<br><br>MURRAY ENERGY CORPORATION, an Ohio corporation; UTAH AMERICAN ENERGY, INC., a Utah corporation; ANDALEX RESOURCES, INC., a Delaware corporation; AGAPITO ASSOCIATES, INC., a Colorado corporation; INTERMOUNTAIN POWER AGENCY (IPA), a political subdivision of the State of Utah; LOS ANGELES DEPARTMENT OF WATER AND POWER (LADWP), a political subdivision of the State of California; and JOHN DOES 1-10,<br><br>              Defendants. | **SUMMONS**<br><br><br><br><br><br><br><br><br>Civil No.:  110916617<br><br>Judge:   Sandra Peuler |

THE STATE OF UTAH TO DEFENDANT: **UTAH AMERICAN ENERGY, INC.**,

Registered Agent   -    C T CORPORATION SYSTEM
                              136 East South Temple, Suite 2100
                              Salt Lake City, UT 84111

1

You are hereby summoned and required to file an ANSWER in writing to the

COMPLAINT in the above-entitled case within thirty (30) days after service of this Summons.

You must file your written ANSWER with the Clerk of the Court at the Third Judicial District

Court in and for Salt Lake County, State of Utah at the following address: 450 South State, P.O.

Box 1860, Salt Lake City, UT 84114, (801) 238-7315. You must also mail or deliver to

Heideman, McKay, Heugly & Olsen, L.L.C., Plaintiff's attorney, at the above address, a copy of

the ANSWER within thirty (30) days after service of this SUMMONS upon you.

If you fail to do so, JUDGMENT BY DEFAULT will be taken against you for the relief

demanded in said COMPLAINT that is on file with the Clerk of Third Judicial District Court, a

copy of which COMPLAINT is hereto annexed and herewith served upon you.

DATED this _____ day of August, 2011.

**HEIDEMAN, MCKAY, HEUGLY, & OLSEN, L.L.C.**

SONNY J. OLSEN,
Attorney for Plaintiff

Defendant:

UTAH AMERICAN ENERGY, INC.
29325 Chagrin Blvd. #300
Pepper Pike, OH  44122

2

 CT Corporation

**Service of Process Transmittal**
08/17/2011
CT Log Number 519009785



TO: Chris Van Bever, Associate General Counsel
Murray Energy Corporation
101 Prosperous Place, Suite 125
Lexington, KY 40509

RE: **Process Served in Ohio**

FOR: Murray Energy Corporation (Domestic State: OH)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Mitch Horton, Pltf. vs. Murray Energy Corporation, etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint |
| **COURT/AGENCY:** | Salt Lake County Third Judicial District Court, UT<br>Case # 110916617 |
| **NATURE OF ACTION:** | Personal Injury - Pltf. was injured on August 16, 2007, while attempting to rescue the six trapped miners |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Cleveland, OH |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 08/17/2011 at 14:38 |
| **JURISDICTION SERVED :** | Ohio |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Sonny J. Olsen<br>Heideman, McKay, Heugly, & Olsen, LLC<br>2696 North University Avenue<br>Suite 180<br>Provo, UT 84604<br>801-812-1000 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex Standard Overnight , 795091884958<br>Image SOP<br>Email Notification, Chris Van Bever cvanbever@coalsource.com<br>Email Notification, Michael O McKown mmckown@coalsource.com<br>Email Notification, Kathy Bartek kbartek@coalsource.com<br>Email Notification, Robert E Murray bobmurray@coalsource.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:**<br><br><br>**TELEPHONE:** | C T Corporation System<br>Debra Justice<br>1300 East 9th Street<br>Suite 1010<br>Cleveland, OH 44114<br>216-621-4270 |

Page 1 of  1 / KS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

SONNY J. OLSEN (USB 11308)
**HEIDEMAN, MCKAY, HEUGLY, & OLSEN, LLC**
2696 North University Avenue, Suite 180
Provo, UT 84604
Telephone: (801) 812-1000
Fax: (801) 374-1724
Email: solsen@hmho-law.com
Attorney for Mitch Horton

DATE:_____

TIME:_____

WHO:_____

BY:_____

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MITCH HORTON,<br><br>        Plaintiff,<br><br>v.<br><br>MURRAY ENERGY CORPORATION, an Ohio corporation; UTAH AMERICAN ENERGY, INC., a Utah corporation; ANDALEX RESOURCES, INC., a Delaware corporation; AGAPITO ASSOCIATES, INC., a Colorado corporation; INTERMOUNTAIN POWER AGENCY (IPA), a political subdivision of the State of Utah; LOS ANGELES DEPARTMENT OF WATER AND POWER (LADWP), a political subdivision of the State of California; and JOHN DOES 1-10,<br><br>        Defendants. | **SUMMONS**<br><br><br><br><br><br>Civil No.: 110916617<br><br>Judge:  Sandra Peuler |

THE STATE OF UTAH TO DEFENDANT: **MURRAY ENERGY CORPORATION,**

Registered Agent:    CT Corporation System
                     1300 East Ninth Street
                     Cleveland, OH  441124

1

You are hereby summoned and required to file an ANSWER in writing to the COMPLAINT in the above-entitled case within thirty (30) days after service of this Summons. You must file your written ANSWER with the Clerk of the Court at the Third Judicial District Court in and for Salt Lake County, State of Utah at the following address: 450 South State, P.O. Box 1860, Salt Lake City, UT 84114, (801) 238-7315. You must also mail or deliver to Heideman, McKay, Heugly & Olsen, L.L.C., Plaintiff's attorney, at the above address, a copy of the ANSWER within thirty (30) days after service of this SUMMONS upon you.

If you fail to do so, JUDGMENT BY DEFAULT will be taken against you for the relief demanded in said COMPLAINT that is on file with the Clerk of Third Judicial District Court, a copy of which COMPLAINT is hereto annexed and herewith served upon you.

DATED this ___4th___ day of August, 2011.

HEIDEMAN, MCKAY, HEUGLY, & OLSEN, L.L.C.

SONNY J. OLSEN,
Attorney for Plaintiff

Defendant:

MURRAY ENERGY CORPORATION
29325 Chagrin Blvd., Suite 300
Pepper Pike, OH  44122

2

SONNY J. OLSEN (USB 11308)
**HEIDEMAN, McKAY, HEUGLY, & OLSEN, LLC**
2696 North University Avenue, Suite 180
Provo, UT 84604
Telephone: (801) 812-1000
Fax: (801) 374-1724
Email: solsen@hmho-law.com
Attorney for Mitch Horton

---

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MITCH HORTON, | **COMPLAINT** |
| Plaintiff, | **AND** |
| v. | **JURY DEMAND** |
| MURRAY ENERGY CORPORATION, an Ohio corporation; UTAH AMERICAN ENERGY, INC., a Utah corporation; ANDALEX RESOURCES, INC., a Delaware corporation; AGAPITO ASSOCIATES, INC., a Colorado corporation; INTERMOUNTAIN POWER AGENCY (IPA), a political subdivision of the State of Utah; LOS ANGELES DEPARTMENT OF WATER AND POWER (LADWP), a political subdivision of the State of California; and JOHN DOES 1-10, | Civil No.:  110916617 |
| | Judge:   Sandra Peuler |
| Defendants. | |

1

For causes of action against the Defendants, Plaintiffs allege as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff Mitch Horton ("Horton") is a citizen and resident of the State of Utah.

2.      Defendant Murray Energy Corporation ("Murray Energy") is an Ohio corporation doing business in the State of Utah.

3.      Defendant Utah American Energy, Inc. ("UEI") is a Utah corporation doing business in the State of Utah.

4.      Defendant Andalex Resources, Inc. ("Andalex") is a Delaware corporation doing business in the State of Utah.

5.      Defendant Agapito Associates, Inc. ("Agapito") is a Colorado corporation doing business in the State of Utah.

6.      Defendant Intermountain Power Agency ("IPA") is a separate legal entity and political subdivision of the State of Utah.

7.      Defendant Los Angeles Department of Water and Power ("LADWP") is a separate legal entity and political subdivision of the State of California.

8.      All notices and acts required as conditions precedent to the filing of this action against the governmental entity Defendants have been properly accomplished, and the claims have been, or are deemed to be, denied.  Pursuant to Utah Code 63G-4-201 (3)(a) notice was sent to Intermountain Power Agency ("IPA") which is under the control and management of the Los

2

Angeles Department of Water and Power by contract operating in the state of Utah. All of the other Defendants are corporations respectively foreign and domestic to the State of Utah.

9.     This Court has jurisdiction over this action under section 78A-5-102(1) of the Utah Code Annotated. All notices and acts required as conditions precedent to the filing of this action against the governmental entity Defendants have been properly accomplished, and the claims have been, or are deemed to be, denied. *See* Utah Regulation R641-114-100 (Persons must exhaust their administrative remedies in accordance with Section 63G-4-401, Utah Code Annotated (1953, as amended), prior to seeking judicial review, unless there is an exception provided for by statute. The IPA was created by Utah Interlocal Cooperation Act, Title 11, Chapter 13, Utah Code Annotated; *See also* IPA Annual Disclosure Report for Fiscal Year 2009-2010, page 4, 1st ¶. Section 208 provides that a public agency under this statute cannot be relieved of a "legal obligation or responsibility", and Section 309 confirms venue is proper in the state district court, for matters not involving controversies over Board actions or contracts).

10.    Venue is proper pursuant to section UCA §78B-3-307.

## GENERAL ALLEGATIONS
### History and Ownership of the Mine

11.    Plaintiff Horton was a rescuer of several trapped minors in the Crandall Canyon Mine Disaster. While attempting to rescue the six trapped miners, Plaintiff was injured on August 16, 2007. Plaintiff also observed the injuries and deaths and the circumstances leading to the injuries and deaths of his colleagues who were also attempting to rescue the victims.

12.    Crandall Canyon Mine has been in operation for many years, first beginning in 1939

3

and continuing through 1955. Genwal Coal Company resumed mining there in 1983.

13.    In 1990 IPA acquired a 50% ownership interest in the mine.

14.    In 1995 Andalex acquired ownership of Genwal Coal Company and the other 50% ownership of Crandall Canyon Mine.

15.    In 1995 Andalex and IPA initiated longwall mining at Crandall Canyon, which greatly increased coal production.

16.    The owners changed the name of the mine operator, Genwal Coal Company, to Genwal Resources, Inc. ("Genwal"). Genwal was the operator of the mine continuously from 1995 through August 2007, and was the employer of the miners who were killed and injured on August 6 and 16, 2007.

17.    By 2007 the mine was approaching the end of its working life. The owners were proceeding with plans to mine out portions of the remaining coal from the rooms and pillars in the main entries ("mains") and from barrier pillars left in place after longwall mining had ceased.

18.    Murray Energy, through its wholly owned subsidiary UEI, acquired the assets of Andalex on August 6, 2006, exactly one year before the catastrophic "bounce" (a violent ejection of rock and coal from the roof, ribs or floor) in the mine that killed the Plaintiff's fellow miners.

### Crandall Canyon Mine Operations Before Ownership by Murray Energy

19.    Prior to the acquisition of Andalex by UEI, thousands of feet of coal had been mined from longwall panels seven through twelve on the north and thirteen through eighteen on the south at the Crandall Canyon Mine in the West Mains area.

20.    In the middle of these two parallel sets of mined out longwall panels were the West Mains areas of room and pillar mining, the entries which functioned as access, ventilation, and coal haulage roads. These mains also provided partial support of the roof due to the pattern of parallel

4

entries and intersecting cross cuts that left square or rectangular coal pillars throughout the length of the mains.

21.     The longwall gob provides little if any support of the roof over the mined out areas. Much of the weight of the overburden above the gob is transferred to barrier coal pillars intentionally left along the sides of the mined out areas to provide roof support.

22.     The previous owners of the Crandall Canyon Mine had left very long barrier pillars of coal approximately 450 feet wide along the sides of the longwall gob. The barrier pillars provided protection for miners from the heavy overburden in the area by spreading the stresses from the overburden onto sufficient amounts of coal pillars so that pressures and stresses were not dangerously concentrated on too little coal.

23.     If the pressures and stresses from the overburden become too high, or are concentrated on too small amounts of coal pillars after mining in the area has been performed, the risk of violent and dangerous bounces – explosions of coal and rock – is increased. The risk of bounces increases dramatically as the depth of the overburden above the coal seam increases.

24.     The Crandall Canyon Mine is a "deep cover" coal mine, defined as one with overburden over 750 feet deep. In the area of the north and south barrier pillars of West Mains where Defendants were mining in 2007, the overburden was between 1,300 and 2,200 feet deep.

25.     In 2004, Andalex, which, along with IPA, owned the Crandall Canyon Mine at the time, notified the United States Mine Safety and Health Administration ("MSHA") and the Bureau of Land Management ("BLM") that it intended to seal the West Mains of the Crandall Canyon Mine due to deteriorating conditions of the pillars in the mains. Andalex had concluded from its engineering studies that pulling out the remaining pillars and allowing controlled roof collapses as the miners retreat

5

towards the mine entrance – "retreat mining" – could not be safely accomplished.

26.    MSHA approved the plan to seal the West Mains in October 2004. On November 4,

2004, BLM Inspector Stephen Falk visited the Crandall Canyon Mine and reported that West Mains were

taking unacceptable weight and that the situation in West Mains made future pillar recovery untenable.

Engineer Falk wrote clearly of the danger presented by pulling the pillars in West Mains:

> "No mining company in the area has ever pulled pillars in main entries with mined out
> sides and under 1500+ feet of cover . . . . Attempts to split pillars under this depth
> could not hold the top and prevent pillar outbursts
> . . . . Depth of cover precludes pillar recover[y]  even if there were no mined
> out sections next door. Weight on the pillars is substantial and dangerous
> conditions are present. Mining any of the coal in the pillars will result in
> hazardous mining conditions such as pillar bursts and roof falls."

27.    In February 2005, BLM echoed engineer Falk's findings and, despite its charge to

maximize recovery of coal reserves, approved Andalex's plan to seal the West Mains:

> "We agree that the pillars in Main West inby crosscut 116 cannot be recovered safely
> or practically. We also concur with sealing the area as the coal is not recoverable . .."

28.    Andalex had been doing retreat mining in 2006 in the South Mains of the mine, which also

were located between two sets of longwall gob.

29.    The retreat mining in the South Mains had been plagued with bounces and roof collapses,

especially as it came under deeper cover, although no serious mining accidents had been reported.

30.    Regarding the barrier pillars in the mine, Andalex submitted a mining plan in April

2005 to the Utah Division of Oil, Gas and Mining ("DOGM") providing that *"solid coal barriers will be*

*left [in the Crandall Canyon Mine] to protect main entries from mined out panels and to guarantee*

*stability of the mine entries for the life of the mine."* This was consistent with earlier mine plans to preserve

the barrier pillars in the mine for safety reasons. Genwal Coal Company, the operator of the mine, had documented that:

> *"the plan shows no [retreat] mining of barrier pillars is planned at this time. Barrier pillars are designed to protect mine workings by supporting stresses that are redistributed from the mining of section panels. Because these barriers are 'loaded up' with high concentrations of stresses it is not good mining practice to [retreat] mine barrier pillars and in fact could be dangerous."*

31.     In 2006, Andalex proposed to do development mining (room and pillar mining "inby," or towards the interior) of the north and south barrier pillars along the West Mains. The plan was to mine some of the 450-foot-wide barrier pillars, leaving thinner solid "remnant" barrier pillars adjacent to the gob, and creating rooms and pillars from the rest of the barrier pillars.

### Crandall Canyon Mine Operations After Ownership by Murray Energy

32.     On August 6, 2006, Murray Energy's wholly owned subsidiary UEI acquired Andalex and its percentage ownership of the Crandall Canyon Mine. Thereafter, Murray Energy's subsidiaries UEI and Andalex and IPA co-owned the Crandall Canyon Mine.

33.     Murray Energy and UEI/Andalex immediately pressed ahead with the plan to do development mining of the north barrier pillar, commencing mining in November 2006.

34.     Murray Energy and UEI/Andalex not only pushed ahead with the barrier pillar development, but also decided to retreat mine the pillars created from the barrier development, contrary to the long-standing plans of the prior mine owners not to retreat mine the West Mains barrier pillars, and contrary to previous assessments of prior owner management and officials that retreat mining of the barriers was unsafe.

7

### Agapito Encourages Barrier Pillar Retreat Mining

35.      Murray Energy and UEI/Andalex employed Agapito to provide them with an engineering analysis to justify their plan to do development *and* retreat mining of the West Mains barrier pillars.

36.      Agapito did the engineering analysis and presented to Murray Energy and UEI/Andalex its conclusions and recommendations in three stages, in July 2006, August 2006, and April 2007.

37.      Agapito calculated the stability factors of the standard production coal pillars and barrier Pillars using both the ARMPS – Analysis of Retreat Mining Pillar Stability – and LAMODEL modeling, concluding in its reports to UEI/Andalex that the north and south barrier pillars could be safely mined in development and also in retreat.

38.      Agapito's analysis was flawed and not conservative in the least, and its conclusions were critically unsafe. The United States National Institute of Occupational Safety and Health ("NIOSH") found in a September 2007 study that Agapito's modeling was "very unconservative" and "substantially overstate[d]".

39.      NIOSH, from comprehensive analyses of coal mines in 1996 and 2002, had determined and published that the recommended minimum production pillar stability factor for deep cover mines was 0.8, and the recommended minimum barrier pillar stability factor for deep cover mines was 2.0. Agapito's modeling using ARMPS showed production pillar stability factors ranging from 0.32 to 0.52, and barrier pillar stability factors ranging from 0.91 to 0.95 – stability factors far lower than, and in most cases less than half of, the NIOSH minimum recommended stability factors.

40.      Agapito's analysis using LAMODEL was likewise unrealistic, flawed, and not conservative enough due to improper assumptions and data concerning coal strength throughout the area

8

and improper assumptions of stress concentrations and convergence. Agapito's flawed analysis led it to report to UEI/Andalex erroneous and improperly high stability factors. NIOSH has found that the Agapito LAMODEL analysis was "misleading" with a "conspicuous lack of scientific, quantitative design criterion."

43. Agapito engineers knew that their ARMPS stability factors for the West Mains barrier pillar mining plan were far below the NIOSH minimums. But, Agapito justified its plan, claiming that the pillars *"are not intended for long-term performance and, therefore, can accept a reduced design safety margin compared to typical life-of mine mains pillars."* Agapito infamously gambled that *"[b]ecause rib yielding and roof sag are time-dependent effects, it is probable that mining will be completed in the barriers before rib and roof conditions show advanced deterioration."* By providing a plan allowing Murray Energy to mine out most of the West Mains barrier pillar coal, Agapito failed to properly assess all the risks of the mining conditions and lost its bet. But, it was the Plaintiff that paid the dramatic vprice of Agapito's irresponsible gamble in his attempts to rescue the trapped miners.

### Murray Energy's Unsafe Plan to Mine the West Mains Barrier Pillars

42. Based in part on the first two misleading and flawed Agapito reports to UEI/Andalex, Murray Energy and UEI/Andalex obtained MSHA approval for retreat mining in the north barrier and began retreat mining on February 16, 2007. The MSHA approval was obtained despite the prior warnings of an MSHA inspector, Pete Del Duca, that complete retreat mining in the north barrier pillar would be unsafe.

43. Almost immediately Murray Energy and UEI/Andalex submitted a plan to begin development mining in the south barrier pillar, again basing their plan in part on the flawed Agapito

analysis.

44.    BLM inspector Falk visited the Crandall Canyon Mine on February 27, 2007 and reported that he was concerned with the north barrier pillar extraction progress.

45.    In March 2007, as the retreat mining came under deeper cover, repeated bounces, roof falls and rib sloughage occurred. These dangerous conditions were discussed in a meeting of the mine owners and agents, Murray Energy, UEI, IPA, and LADWP, on March 10, 2007, and were specifically acknowledged by Murray Energy CEO Robert Murray. Yet none of these increasingly ominous signs of danger during the first ten days of March were recorded by Murray Energy or UEI/Andalex in the pre-shift logs, which MSHA required them to keep and make available to MSHA inspectors.

46.    On March 11, 2007, a major bounce occurred in the north barrier during retreat mining. The bounce was so violent that it destroyed parts of the ventilation system, stoppings, and other structures in over 800 feet in the area, forcing the abandonment and sealing of that section of the mine. Apparently, and fortunately for all involved, no one was seriously injured in that event.

47.    The March 11 bounce was required to be reported to MSHA *immediately* (within 15 minutes), but Murray Energy and UEI/Andalex deliberately did not do so, apparently justifying their violation of the reporting regulation by their decision to cease retreat mining in the north barrier. Robert Murray was personally notified of the March 11 bounce that very day and also attended a mine owners' meeting by phone on March 21, at which the north barrier bounce was discussed in detail, contradicting his public claims in August 2007 after the disaster that he had no prior knowledge of the March 11 north barrier bounce.

48.    In light of the March 11, 2007, bounce, Genwal asked Agapito to "refine the pillar

10

design" for the south barrier retreat mining plan based on the bounce in the north barrier pillar. Agapito provided a revised plan on April 18, which essentially increased the pillar length of the development pillars from 80 x 92 feet to 80 x 129 feet, "*which helps to isolate bumps to the face and reduce the risk of larger bumps overrunning crews in outby locations.*"

49.     Agapito's revised south barrier pillar development and retreat plan also provided that the remnant barrier pillar would be reduced to only 97 feet width, and would be "slabbed," meaning that 40-foot-long cuts of coal would be taken out of the remnant barrier. Agapito recognized that the "*slabbed barrier will be subject to side abutment loads from gob on both sides, resulting in elevated stress levels through the core.*"

50.     Even before receiving the Agapito revisions of the pillar recovery plan in April, Murray Energy and the mine co-owners continued the same barrier mining plan in the south barrier pillar, only 900 feet from where they had been mining in the north barrier from February 16 to March 11. The cover and conditions were virtually identical, and so were the risks and dangers.

51.     The devastating March 11 bounce made absolutely no difference to Murray Energy management, and Murray Energy and the mine co-owners proceeded with their plan to mine the south barrier pillar in the very same dangerous fashion they had done in the north barrier, demonstrating greedy determination to mine the easily accessible coal without regard to safety.

52.     Had Murray Energy and the mine co-owners conducted post-failure modeling of the March 11, 2007, bounce, they could have accurately determined the stress levels at which the coal pillars failed (bounced). Such a comparison would have shown south barrier pillar stress levels as great as the stress levels which caused failure in the north barrier, again indicating excessive pillar loading and a predictable pillar bounce.

11

53.     However, Murray Energy and the mine co-owners conducted no failure analysis of the north barrier pillar bounce and no comparison of the existing primary bounce conditions (depth of cover, geologic environment, and coal strength), even though the most cursory comparison would have strongly indicated the probability of a second devastating bounce while mining in the south barrier pillar.

54.     On July 17, less than three weeks before the disastrous bounce of August 6, Murray Energy and UEI/Andalex began retreat mining the south barrier pillar.

### Murray Energy Continued to Retreat Mine Despite Warnings and Signs of Danger, and in Contravention of Express Mine Plan Prohibitions

55.     Based on inspected conditions in the south barrier area in late May 2007, MSHA had required modification of the Roof Control Plan in the area of crosscuts 139 to 142 by requiring three additional pillars to be left in place, and to not slab the remnant pillar. These changes to the plan were not followed. The pillars were pulled and the remnant barrier was slabbed in direct contravention of the Roof Control Plan and MSHA restrictions, at the very site where miners were working at the time of the mine bounce of August 6, 2007.

56.     As with the north barrier, signs of increased pressure and stress mounted as south barrier development proceeded in May, June, and July. On June 5th Genwal manager reported to the UEI manager *"constant bumping and sloughing of the ribs,"* although the pre-shift reports again do not reflect adverse seismic events or mine conditions. On June 22 UEI President Bruce Hill reported to Robert Murray in a memo that *"several bumps are occurring and the ribs show significant signs of sloughage,"* which Mr. Murray acknowledged by writing *"noted."*

57.     After retreat mining began on or about July 16, company reports revealed

increasingly bad conditions as the retreat proceeded under deeper cover. Mr. Hill reported by an August 3 memo to Mr. Murray that "significant sloughage is occurring outby the face."

58.     Mr. Murray was expressly informed that south barrier pillars were being pulled and retreat mining was in full swing just before the August 6 bounce, in contrast to his repeated denials at press conferences in the days after the bounce that retreat mining was being done.

59.     On August 2 a management meeting report noted "a lot of floor heaving that took a lot of clean up." On August 3 an internal safety report documented a bounce occurred just before the night shift. Most of these increasing stress signals were not reflected in the company pre-shift logs for review by MSHA.

60.     In addition to the violations noted above of the amended Roof Control Plan, Murray Energy and UEI/Andalex had been violating express prohibitions against mining coal from the floor during pillar pulling operations, including on August 6, at the time of the fatal bounce. The illegal practice at Crandall Canyon Mine of mining floor coal was commonplace and was well known by, and appears to have been condoned and encouraged by, Murray Energy CEO Robert Murray.

### The Fatal August Bounces and Rescue Efforts

61.     Early in the morning of August 6, 2007, the catastrophic bounce registering 3.9 at the University of Utah seismology lab occurred, trapping and eventually killing Kerry Allred, Don Erickson, José Luis Hernandez, Juan Carlos Payan, Brandon Phillips, and Manuel Sanchez.

62.     The August 6 disaster triggered frenetic rescue efforts by MSHA and Murray Energy. Robert Murray and Murray Energy usurped MSHA's statutory duty to oversee, supervise, and run the rescue operation. As a result, Murray Energy, acting primarily through and by its CEO, Robert Murray,

13

took over the management of the rescue advisories, updates, and meetings with mine victim families and friends. Murray Energy engaged in multiple acts of abusive and unconscionable behavior, subjecting the Plaintiff to additional and inexcusable emotional pain and upset.

63.     Rescue efforts were hampered by repeated bounces and other seismic events throughout the next ten days, which damaged roof supports, rescue and digging equipment, and passageways. By August 16 rescue teams had progressed only about 800 feet of the approximately 2000+ feet to the estimated location of the trapped miners.

64.     In or about August 16 an explosive bounce occurred near the site of the rescue operations Nine rescuers were caught in the bounce. Three miners, Dale Black, Brandon Kimber, and Gary Jensen were killed. Six other rescuers, including the Plaintiff, were injured.

65.     Deteriorating conditions and increasing seismic events at the site of the rescue operations preceded the fatal bounce in the last few days before August 16, yet operations continued.

66.     As a result of the August 16 bounce, all rescue efforts at the level of the entries to the West Mains ceased. After drilling and monitoring seven bore holes from above, all of which were unsuccessful in detecting any signs of life, all rescue and recovery efforts were terminated on September 1, 2007.

## Defendants Owed and Breached Duties of Care

67.     Defendants owed duties of care to Plaintiff, based on each Defendant's respective responsibilities activities, involvement, and efforts in connection with retreat mining in the West Mains areas of the Crandall Canyon Mine in 2007.

68.     Defendants prepared, contributed to, participated in, or oversaw the preparation and

14

implementation of the plans to mine in the West Mains at the Crandall Canyon Mine; required, permitted, encouraged, or failed to prevent dangerous and inappropriate mining activities or practices; and otherwise engaged or were involved in the implementation and conduct of the plans, practices, and activities at Crandall Canyon Mine, as described above.

69.     Careful and conservative planning and execution of safe mine plans and sufficient safety margins were necessitated by virtue of the inherent and extraordinary hazards of the mining being done in the Crandall Canyon Mine, including but not limited to retreat mining under deep cover.

70.     Murray Energy, UEI, Andalex, IPA, and LADWP had duties to Plaintiff to keep and maintain the mine in reasonably safe condition.

71.     Murray Energy, UEI, Andalex, IPA, and LADWP knew, or should have known, that their premises were in a dangerous condition that posed unreasonable hazards to those working in and entering the mine.

72.     Defendants breached their respective duties of care to Plaintiff by negligently, recklessly, or intentionally acting or failing to act as described above, including their failure and refusal to create, use, follow, or implement careful, safe, and conservative mining plans for the West Mains areas.

73.     Defendants negligently, recklessly, or intentionally, in contravention of approved plans, good mining practices, and common sense, engaged in mining activities and extracted coal in methods and ways that led to unsafe degradation of structural integrity, support, and stability within the Crandall Canyon Mine, which acts and omissions directly and proximately caused the explosive bounces described above and the subsequent deaths of Plaintiff's colleagues and caused the significant injuries of Plaintiff.

74.     Murray Energy and UEI/Andalex negligently, recklessly or intentionally, in contravention

15

of approved plans, mining laws, good mining practice, and common sense, took over the rescue efforts and operations and sent Plaintiff into the mine in the face of warnings and signs of grave danger of further catastrophic bounces.

75.     Murray Energy and UEI/Andalex, by and through Robert Murray and others, usurped MSHA responsibilities regarding communications and interactions with the miner victims' families in violation of applicable mining laws and human decency, provided information to the Plaintiff that was false or misleading, and treated the Plaintiff in a disrespectful, abusive, and insensitive manner, causing him extreme emotional suffering, fear, and upset.

76.     The acts and omissions by the Defendants as described above were motivated by avarice and greed, at the expense of safety and human life, are shocking to the conscience, manifested a knowing and reckless indifference toward and a disregard of the rights of the Plaintiff justifying the imposition of punitive damages.

77.     The Defendants are vicariously liable for the negligent, reckless, and intentional acts and omissions of their respective employees and agents.

### FIRST CAUSE OF ACTION
### Personal Injuries -- All Defendants

78.     Plaintiff incorporates the allegations of paragraphs 1 through 77, above.

79.     On August 16, 2007, Mitch Horton was acting within the scope of his employment with Genwal. He was attempting to rescue the men trapped in the mine when another mine bounce and subsequent collapse occurred, severely injuring him.

80.     Defendants, or one or more of them as owners, managers, consultants to, or overseers of the Crandall Canyon Mine, reserved and undertook to perform various duties and responsibilities related

16

to the design, engineering, planning, and operation of the mine and mine rescue efforts, including but

not limited to the following:

(a)   Providing for safety in the mine;

(b)   Preparing, reviewing, and approving mine plans, practices, and procedures and seeing that they were followed;

(c)   Preparing, reviewing, and approving plans, practices, and procedures for roof control systems and seeing that they were followed;

(d)   Reviewing and implementing rock mechanics and geological studies and practices;

(e)   Setting and fostering attitudes regarding production and profit in relation to safety;

(f)   Deciding when, whether, and how the mine rescue and recovery efforts would be undertaken;

(g)   Determining the equipment, materials, and supplies to be used in, and in association with, the mine rescue and recovery efforts; and

(h)   Determining and implementing the proper methods and materials to detect, prevent, control, and protect from subsequent bounces, collapse and other undesirable and unplanned ground movement, knowing that a catastrophic bounce and mine collapse had already occurred.

81.   Defendants negligently, recklessly, or intentionally performed or failed to perform those

duties and undertakings, directly and proximately causing the severe injuries to Mitch Horton.

82.   As a direct and proximate result of Defendants' acts and omissions described above,

Plaintiff Mitch Horton has suffered severe and permanent injuries, including pain and suffering, fear of

death, uncertainty of his predicament, and emotional and mental distress.

83.   As a direct and proximate result of Defendants' acts and omissions described above,

Plaintiff Mitch Horton has incurred and will continue to incur medical expenses, loss of past and future

wages, loss of earning capacity, expenses for household services, and other economic damages.

84.   The acts and omissions of the Defendants resulting in the severe injuries to Mitch

Horton were willful, wanton, and manifested a knowing and reckless indifference toward and a disregard

17

for human life and safety and the rights of Mitch Horton, by reason of which punitive damages should be assessed against the Defendants.

## SECOND CAUSE OF ACTION
### Loss of Consortium -- All Defendants

85.    Plaintiff incorporates the allegations of paragraphs 1 through 77 and 78 through 84, above.

86.    By reason of the severe and significant permanent physical and emotional injuries suffered by Mitch Horton that have substantially changed his lifestyle, Plaintiff Mitch Horton has suffered loss of consortium, companionship, affection, and marital intimacy, all to his damage in amounts to be proved at trial.

## THIRD CAUSE OF ACTION
### Strict Liability for Ultra-Hazardous Activities -- Murray Energy, UEI, Andalex, IPA, and LADWP

87.    Plaintiff incorporates the allegations of the preceding paragraphs.

88.    The activities and conditions that Murray Energy, UEI, Andalex, IPA, and LADWP caused, directed, created, or permitted, were ultra-hazardous and inherently dangerous. These Defendants are strictly liable to Plaintiff for all injuries and damages alleged.

## FOURTH CAUSE OF ACTION
### Premises Liability -- Murray Energy, UEI, Andalex, IPA, and LADWP

89.    Plaintiff incorporates the allegations of the preceding paragraphs.

90.    Murray Energy, UEI, Andalex, IPA, and LADWP had duties to keep their property in reasonably safe condition.

18

91.     Murray Energy, UEI, Andalex, IPA and LADWP created, maintained, or permitted conditions at the Crandall Canyon Mine that were unreasonably dangerous and posed unreasonable hazards to those who worked in or entered the mine, by reason of which they are liable to Plaintiff for the damages alleged.

## FIFTH CAUSE OF ACTION
### Infliction of Emotional Distress – Murray Energy, UEI, and Andalex

92.     Plaintiff incorporates the allegations of paragraphs 1 through 91, above.

93.     The conduct of Murray Energy, UEI, and Andalex, by and through their agents, including but not limited to Robert Murray, was outrageous and intolerable and offended generally accepted standards of decency, morality, and civility.

94.     Murray Energy, UEI, and Andalex, by and through their agents, including but not limited Robert Murray, intended to cause or acted with reckless disregard of the probability of causing emotional distress or should have realized that their conduct involved an unreasonable risk of causing the Plaintiff's emotional distress.

95.     The conduct of Murray Energy, UEI, and Andalex, by and through their agents, including but not limited to Robert Murray, proximately caused severe emotional distress resulting in illness or bodily harm to Plaintiff, by reason of which Plaintiff should be awarded damages in amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief against Defendants as follows:

1.   For economic damages in amounts to be proved at trial sufficient to fully compensate Mitch

19

Horton, including but not limited to medical expenses, lost wages and benefits, lost earning capacity, and all other recoverable economic damages resulting from his personal injuries;

2.   For all recoverable non-economic damages resulting from the personal injuries to Mitch Horton in amounts to be proved at trial sufficient to fully compensate him;

3.   For damages in amounts to be proved at trial sufficient to fully compensate Plaintiff Mitch Horton for his losses of consortium and all other damages;

4.   For attorneys' fees, expenses, and costs of this action as allowed by law;

5.   For punitive damages in amounts to be determined and assessed against the Defendants, as allowed by law;

6.   For pre-judgment and post-judgment interest in the maximum amounts allowed by law; and

7.   For such further relief as this Court deems necessary, just, and proper.

### JURY DEMAND

Plaintiff demands a trial by jury of all claims asserted in this complaint.

DATED this ___3rd___ day of ___August___, 2011.

HEIDEMAN, MCKAY, HEUGLY & OLSEN

SONNY OLSEN
Attorney for Plaintiff

Dale J. Lambert, #1871
CHRISTENSEN & JENSEN, P.C.
15 West South Temple, Suite 800
Salt Lake City, Utah 84101
Telephone: (801) 323-5000
Dale.Lambert@chrisjen.com
*Attorneys for Agapito Associates, Inc.*

IN THE THIRD JUDICIAL DISTRICT COURT
SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MITCH HORTON,<br><br>        Plaintiff,<br><br>vs.<br><br>MURRAY ENERGY CORPORATION, an Ohio corporation; UTAHAMERICAN ENERGY, INC., a Utah Corporation; ANDALEX RESOURCES, INC., a Delaware corporation; AGAPITO ASSOCIATES, INC., a Colorado Corporation; INTERMOUNTAIN POWER AGENCY (IPA), a political subdivision of the State of Utah; LOS ANGELES DEPARTMENT OF WATER AND POWER (LADWP), a political subdivision of the State of California; and JOHN DOES 1-10,<br><br>        Defendants. | **MOTION FOR MORE DEFINITE STATEMENT**<br><br>Case No.: 11091667<br><br>Judge Sandra N. Peuler |

Defendant, Agapito Associates, Inc. ("Agapito"), hereby moves the court for a more definite statement in the Complaint on the grounds that the Complaint is indefinite, ambiguous, and vague as to the nature of Plaintiff's injuries that are the basis of his claims. This Motion is supported by the Memorandum filed in support of the Motion for a More Definite Statement

filed by Defendants Murray Energy Corporation, UtahAmerican Energy, Inc. and Andalex Resources, Inc.  To promote judicial economy, that Memorandum in Support of Motion for More Definite Statement is incorporated by reference as though filed separately by Agapito.

DATED this ⎽⎽⎽⎽⎽ day of September, 2011.

CHRISTENSEN & JENSEN, P.C.

Dale J. Lambert
*Attorneys for Agapito Associates, Inc.*

CERTIFICATE OF SERVICE

I hereby certify that on this ___16th___ day of September, 2011, I have caused the foregoing **MOTION FOR MORE DEFINITE STATEMENT** to be served via postage pre-paid, regular mail, upon the following:

Sonny J. Olsen
Daniel W. McKay
HEIDEMAN, McKAY, HEUGLEY & OLSEN, LLC
2696 North University Avenue, Suite 180
Provo, UT  84604

Dusten L. Heugly
HEIDEMAN, McKAY, HEUGLEY & OLSEN, LLC
1375 South 100 East
Price, UT  84501

Kevin N. Anderson
Jason W. Hardin
FABIAN & CLENDENIN
215 South State Street, St. 1200
Salt Lake City, UT  84111


Karen Atwood

13Y6871                                       3

FILED
.U DISTRICT COURT

11 SEP 16 PH 4: 21

.ALT LAKE DEPARTMENT

BY _____
DEPUTY CLERK

Kevin N. Anderson (0100)
Jason W. Hardin (8793)
FABIAN & CLENDENIN,
 a Professional Corporation
215 South State Street, Suite 1200
Salt Lake City, Utah 84111-2323
Telephone:     (801) 531-8900
Facsimile:      (801) 596-2814
kanderson@fabianlaw.com
jhardin@fabianlaw.com

Attorneys for Defendants Intermountain Power Agency
and Los Angeles Department of Water and Power

IN THE THIRD JUDICIAL DISTRICT COURT

IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| MITCH HORTON,<br><br>    Plaintiff,<br><br>vs.<br><br>MURRAY ENERGY CORPORATION, an<br>Ohio corporation; UTAHAMERICAN<br>ENERGY, INC., a Utah corporation;<br>ANDALEX RESOURCES, INC., a<br>Delaware corporation; AGAPITO<br>ASSOCIATES, INC., a Colorado<br>corporation; INTERMOUNTAIN POWER<br>AGENCY (IPA), a political subdivision of<br>the State of Utah; LOS ANGELES<br>DEPARTMENT OF WATER AND POWER<br>(LADWP), a political subdivision of the<br>State of California; and JOHN DOES 1-10,<br><br>    Defendants. | **DECLARATION OF J. R. WHITE IN<br>SUPPORT OF MOTION TO DISMISS<br>DEFENDANTS INTERMOUNTAIN<br>POWER AGENCY AND LOS<br>ANGELES DEPARTMENT OF<br>WATER AND POWER**<br><br>Civil No. 110916617<br><br>Judge Sandra N. Peuler |

I, J. R. White, make the following statement under the penalty of perjury of the laws of the United States of America and the laws of the State of Utah.

1.      I am over the age of eighteen (18).

2.      I have been an employee of Los Angeles Department of Water and Power ("LADWP") since 1990 and have served as the Claims Agent for LADWP since April, 2000.

3.      If LADWP receives any notice of claim, it is forwarded to me.

4.      I have conducted an inquiry within the Claims Section to determine if a notice of claim or any other document has been received from Mr. Mitch Horton or his attorneys and agents since August 2007.

5.      Other than a Summons and Complaint in this matter which I am aware was served on LADWP on August 9, 2011, by service on the Secretary of the Board of Water and Power Commissioners, LADWP has not received a notice of claim or any other document from Mr. Horton, his attorney or his agents from August 2007 until the present date.

DATED this _13_ day of September, 2011.

_____
J. R. White

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 16ᵗʰ day of September, 2011, I caused a true and correct copy of the foregoing **DECLARATION OF J. R. WHITE IN SUPPORT OF MOTION TO DISMISS DEFENDANTS INTERMOUNTAIN POWER AGENCY AND LOS ANGELES DEPARTMENT OF WATER AND POWER** to be delivered via United States Mail, postage pre-paid, to:

> Sonny J. Olsen
> Dusten L. Heugly
> Daniel W. McKay
> HEIDEMAN, McKAY, HEUGLY, & OLSEN, LLC
> 2696 North University Avenue, Suite 180
> Provo, UT  84604